# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7596 | **DATE** | 4/29/2004 |
| **CASE TITLE** | IL Clean Energy vs. Filan | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendant's motion for summary judgment is granted with respect to Counts II, III and V. Plaintiff's motion for summary judgment is granted with respect to Counts I and IV.

*Amy J. St. E*

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| ✓ | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | APR 30 2004 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| | | date mailed notice |
| TH ✓ | courtroom deputy's initials | |
| | Date/time received in central Clerk's Office | mailing deputy initials |

**Document Number**

**33**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS CLEAN ENERGY<br>COMMUNITY FOUNDATION, an<br>Illinois not-for profit corporation, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | No. 03 C 7596 |
| John B. FILAN, in his official capacity as<br>Director of the Illinois Governor's Office<br>of Management and Budget, | )<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

**DOCKETED**

APR 3 0 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Illinois Clean Energy Community Foundation ("ICECF") sued the state of

Illinois in a five-count complaint for claims arising under the Illinois and United States

constitutions in connection with a statute enacted by the Illinois legislature allowing the state to

demand payment of $125 million from ICECF. Both parties filed for summary judgment. As

discussed in detail below, the Court grants summary judgment in favor of Defendant on

Plaintiff's state-court claims because the Eleventh Amendment of the United States Constitution

bars federal courts from hearing state-law claims against the state. With respect to Counts I and

IV, the Court grants Plaintiff's motion for summary judgment. The state legislature's enactment

of 220 ILCS 5/6-111.1(d) violates Plaintiff's constitutional rights of due process and protection

from takings.

1

33

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). A party will successfully oppose summary judgment only if it presents "definite, competent evidence to rebut the motion." *Equal Employment Opportunity Comm'n v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th Cir. 2002).

## BACKGROUND

In 1999, the Illinois legislature enacted 220 ILCS 5/16-111.1 ("Section 111.1") as part of the Illinois Public Utilities Act (the "Act"). The Act authorizes the creation of an "Illinois clean energy community trust or foundation" for the purpose of providing financial support to public and private entities with the goal of improving energy efficiency and supporting environmental

projects.[1] The underlying history of the Act is somewhat unclear.[2] Both parties agree that the

Act resulted from a "compromise" between Commonwealth Edison Company ("ComEd") and

the state of Illinois in connection with the sale of certain power plants. The parties disagree,

however, as to the nature of the compromise. Plaintiff maintains that the Act merely vested

ComEd with the discretion to create a charitable not-for-profit foundation. (R. 16-1, Pl.'s Resp.

to Def.'s Mot. for Summ. J. p. 4.) Defendant takes a more structured approach, arguing that the

compromise was a "quid-pro-quo" wherein ComEd agreed to fund such a foundation "as part of

the consideration for the State's permission to reap a far larger profit by selling its coal-powered

electricity plants." (R. 18-1, Def.'s Reply in Supp. of Summ. J. p. 8.) Both parties quote Illinois

Representative Novak's description of the Act's predicate:

> You know, Commonwealth-Edison . . . [is] going to realize a
> substantial profit [from the sale of the power plants]. They
> understand that. Probably beyond their comprehension. . . . So what
> has occurred is that Commonwealth-Edison decided well, we need to
> give some back. We asked them, you give some back. We're going
> to allow you . . . to realize a substantial profit. We want you to give
> something back. . . . They're giving things back by forming a

---

[1] Section (a) of the Act provides: "An electric utility which has sold or transferred generating facilities in a transaction to which subsection (k) of Section 16-111 applies is authorized to establish an Illinois clean energy community trust or foundation for the purposes of providing financial support and assistance to entities, public or private, within the State of Illinois including, but not limited to, units of State and local government, educational institutions, corporations, and charitable, educational, environmental and community organizations, for programs and projects that benefit the public by improving energy efficiency, developing renewable energy resources, supporting other energy related projects that improve the State's environmental quality, and supporting projects and programs intended to preserve or enhance the natural habitats and wildlife areas of the State. Provided, however, that the trust or foundation funds shall not be used for the remediation of environmentally impaired property. The trust or foundation may also assist in identifying other energy and environmental grant opportunities." 220 ILCS 5/16-111.1.

[2] The legislative history of the Act is the only material factual dispute between the parties.

3

$250,000,000 trust fund. . . . So, it is give and take.

Transcript of Proceedings of 91st General Assembly at 46 (Ill. May 27, 1999).[3]

Section 111.1 of the Act sets forth certain minimum requirements for trusts and foundations established under it. Under Section 111.1, governing documents of such trusts and foundations must conform to statutory standards regarding the: (1) number of voting and non-voting trustees, and the appointment of a majority thereof by various state officials; (2) maximum compensation of trustees; (3) term of trustee appointments; (4) filling of trustee vacancies; (5) term of the trust or foundation (until no assets remain); (6) minimum amount of funding ($250 million, unless certain other contributions occur); (7) hiring of employees, entering into contracts, and maximum allowable expenses; (8) creation of advisory boards or committees; and (9) required periodic contributions to the Citizens Utility Board. 220 ILCS 5/6-111.1.

On December 21, 1999, ICECF filed its articles of incorporation with the Illinois Secretary of State.[4] The following day, ComEd transferred $225 million to ICECF's bank account. Since its inception, ICECF has "awarded more than 550 grants totaling more than $38 million to public and charitable entities to improve energy efficiency, develop renewable energy resources, and preserve and enhance wildlife habitat . . . across Illinois." (R. 8-1, Aff. of James Mann ¶ 9.)

---

[3] Defendant cites only a portion of this language, but does not object to Plaintiff's broader transcription.

[4] ICECF's articles of incorporation include the following: "[t]he corporation is established pursuant to the authority granted by Section 16-111.1 of the Public Utilities Act . . . . In case of any conflict between the provisions of these articles of incorporation or the bylaws of the corporation and the provisions of Section 16-111.1 of the Public Utilities Act, the provisions of Section 16-111.1 shall govern." (R. 6-2, Def.'s Statement of Facts Ex. 3.)

## A.    The Amendment to the Act

In June 2003, the Illinois legislature amended the Act to impose an additional

requirement on foundations created under the Act.  The legislature added Section 111.1(d),

which requires the trustees of a foundation created under the Act to contribute up to $125 million

to the Illinois state treasury and state environmental agencies upon written demand by the

Director of the Bureau of the Budget.  220 ILCS 5/6-111.1(d).  According to the Act, the purpose

of these diverted funds is to (1) assist with the repayment of general obligation bonds, and (2)

assist in funding the state's environmental programs.  *Id.*

In July 2003, Defendant[5] requested that ICECF transfer $9 million to the General

Obligation Bond Repayment and Interest Fund, and $116 million into the General Revenue Fund,

which includes funds administered by environmental agencies.  (R. 6-2, Def.'s Statement of

Facts ¶ 20.)  ICECF has not transferred these funds.  (*Id.* ¶ 21.)

## B.    ICECF's Complaint

ICECF filed a five-count complaint against the state.  Count I alleges a violation of the

takings clause of the Fifth Amendment of the United States Constitution; Count II alleges a

violation of the takings clause of the Illinois Constitution; Count III alleges a violation of the

special legislation clause of the Illinois Constitution; Count IV alleges a violation of the due

process clause of the Fourteenth Amendment of the United States Constitution; and Count V

alleges a violation of the due process clause of the Illinois Constitution.  Defendant now moves

for summary judgment on all counts of Plaintiff's complaint.  Plaintiff moves for partial

---

[5] Defendant is the Director of the Governor's Office of Management and Budget, the administrative successor to the Bureau of the Budget.

summary judgment on Counts I and IV.

ANALYSIS

## I.    Eleventh Amendment Bars State Claims

Counts II, III, and V allege violations of the Illinois Constitution. Defendant moves for summary judgment on these claims, arguing that the Eleventh Amendment of the United States Constitution prohibits private parties from pursuing state-law claims against the state itself in federal court. The Court agrees.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Am. XI. Despite its narrow language, "the amendment has been construed to forbid suits prosecuted against a state by its own citizens as well." *Benning v. Board of Regents of Regency Univ.*, 928 F.2d 775, 777 n. 1 (7th Cir. 1991) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890)).

A claim that a state official in his official capacity violated state law is a claim against the state, which is protected by the Eleventh Amendment. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S. Ct. 900, 919, 79 L. Ed. 2d 67 (1984); *Radaszewski v. Garner*, No. 01 C 9551, 2002 WL 31430325, at *5 (N.D. Ill. Oct. 21, 2002). The Supreme Court has held that Eleventh Amendment protection applies even though a plaintiff's state claims are subject to pendent jurisdiction: "[w]e concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. . . . We now hold that this principle applies as well to state-law

6

claims brought into federal court under pendent jurisdiction." *Pennhurst*, 465 U.S. at 121, 104 S. Ct. at 919.

Plaintiff argues that, under *Benning*, the Court must apply state rules of immunity when considering state law claims. Plaintiff further argues that Illinois has abolished sovereign immunity. *Benning*, however, squarely comports with *Pennhurst*, noting that the Eleventh Amendment "forbids a federal court from ordering state officials to conform their conduct to state law, reasoning that such relief is unnecessary to vindicate the supreme authority of federal law and contravenes the principles of federalism . . . ." *Benning*, 928 F.2d at 778. The Supreme Court and the Seventh Circuit have spoken decisively on the application of the United States Constitution, thus state law is inapplicable here.

Plaintiff's state-law claims are before the Court by virtue of supplemental jurisdiction under 28 U.S.C. § 1367.[6] As the *Pennhurst* and *Benning* opinions made clear, however, Plaintiff may not make an end run around the Eleventh Amendment using supplemental jurisdiction. ICECF's state-law claims are barred by the Eleventh Amendment of the United States Constitution. Accordingly, the Court grants Defendant's motion for summary judgment with respect to Counts II, III, and V.

## II.     Claims under the United States Constitution

Plaintiff characterizes itself as a non-profit charitable foundation. Because ComEd — not the state — contributed the funds used to create ICECF, Plaintiff argues that its funds are private property, and not public assets of the state. As such, Plaintiff contends that the state is

---

[6] Congress enacted 28 U.S.C. §1367 to codify the judicially created doctrine of pendent jurisdiction.

attempting to seize private property without providing the compensation required by the takings clause of the Fifth Amendment. Further, Plaintiff claims that the state has not provided the procedural or substantive due process required by the Fourteenth Amendment in amending Section 111.1 to allow seizure of ICECF's assets.

## A. Eleventh Amendment

The Eleventh Amendment also prohibits federal courts from entertaining federal claims against a state. The Supreme Court established an exception to this rule in *Ex parte Young*, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908). The Court's exception exempts from the Eleventh Amendment a plaintiff seeking injunction or declaratory judgment to prevent a state official from a prospective or ongoing violation of federal law. *See Williams v. Wisconsin*, 336 F.3d 576, 581 (7th Cir. 2003) ("Official-capacity suits against state officials seeking prospective relief are permitted by § 1983"). The *Young* court theorized that the state official's violation of federal law stripped him of his official authority and justified suit against the official despite the Eleventh Amendment bar. *Id.; see also Benning*, 928 F.2d at 778. Here, ICECF seeks a declaration that Section 111.1(d) violates the takings clause of the Fifth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution. Plaintiff's federal claims, therefore, survive the Eleventh Amendment.

## B. The State's Right to Amend Section 111.1

Defendant argues that the legislature is free to amend its statutes, altering corresponding rights, without subjecting itself to unconstitutional takings[7] or due process claims. In support of

---

[7] "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Am. V. The takings clause of the Fifth Amendment applies to the states through the Fourteenth Amendment, preventing state governments from taking private property without

this claim, the state cites *Pittman v. Chicago Board of Educ.*, 64 F.3d 1098 (7ᵗʰ Cir. 1995). In

that case, public school principals argued that the Illinois legislature's elimination of tenure for

principals amounted to an unconstitutional taking. The Seventh Circuit upheld the statute,

holding that the principals' tenure "is not a term in a contract. It is a term in a statute, and a

statute is presumed not to create contractual rights." *Id.* at 1104. Further, "[a] statute is not a

commitment by the legislature never to repeal the statute." *Id.*

Similarly, the state relies on *Bowen v. Public Service Agencies Opposed to Social*

*Security Entrapment*, 477 U.S. 41, 106 S. Ct. 2390, 91 L. Ed. 2d 35 (1986), for the proposition

that rights granted by statute are not immune to statutory amendment. In that case, Congress

amended the Social Security Act to prevent states and public agencies from withdrawing from

participation in benefits programs. *Id.* at 48. This statute effectively invalidated the termination

provisions of California's agreement with the Secretary of Health and Human Services. *Id.* at 49.

Public agencies of California sued the United States, alleging that the amended statute deprived

them of their contract rights without just compensation in violation of the Fifth Amendment. *Id.*

Noting that "Congress had the authority to provide by amendment whatever rules it might have

prescribed in the original charter[,]" the Supreme Court held that the amendment of the Social

Security Act did not constitute a taking under the Fifth Amendment. *Id.* at 52-56. Interestingly,

the Court pointed out that "Congress' exercise of the reserved power has a limit in that Congress

could not rely on that power to take away property already acquired under the operation of the

charter, or to deprive the corporation of the fruits actually reduced to possession of contracts

---

compensation. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457, 150 L. Ed.
2d 592 (2001); *see Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed.
979 (1897).

9

lawfully made."[8] *Id.* at 55 (citing the *Sinking Fund Cases*, 99 U.S. 700, 25 L. Ed. 496 (1878)) (quotations omitted).

In this case, ICECF was indeed established in connection with an Illinois statute. The property right that ICECF seeks to retain, however, is fundamentally different from the rights asserted by the *Bowen* and *Pittman* plaintiffs. In neither of those cases did the plaintiff seek to prevent the government from taking money from the plaintiff's bank account. In this case, ICECF is trying to avoid writing a check to the state of Illinois for $125 million. This money would come from a fund originally provided to ICECF by ComEd pursuant to Section 111.1. This situation is similar to that forecast in the *Sinking Fund Cases*. These funds are "property already acquired under the operation of the charter." *Sinking Fund Cases*, 99 U.S. at 720. Accordingly, Defendant may not force ICECF to turn over half of its original endowment based solely on the truism that the state of Illinois is able to amend its own statutes.

Because ICECF's bylaws explicitly subordinate themselves to Section 111.1, Defendant argues that any funds contributed to ICECF are therefore public funds. As the discussion of the *Sinking Fund Cases* illustrates, however, the state's right to amend a statute is limited. The fact that ICECF's bylaws are subordinate to an Illinois statute does not extend that limit.

## C.     ICECF's Funds Are Not Public Property

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." Defendant argues that because ICECF is a state-created and state-

---

[8] The *Bowen* court determined that "the 'contractual right' at issue in [that] case bears little, if any, resemblance to rights held to constitute 'property' within the meaning of the Fifth Amendment," thus defeating any arguments based on the potential overreaching described in the *Sinking Fund Cases*. *Bowen*, 477 U.S. at 55.

controlled public foundation, its funds are not private property. If ICECF's funds are not private property, the state argues, then there can be no claim of an unconstitutional taking.

### 1. *Great Lakes* Holding

*Great Lakes Higher Education Corp. v. Cavazos*, 911 F.2d 10 (7th Cir. 1990), addressed a situation similar to ICECF's in connection with the characterization of funds as public or private. In that case, the federal government subsidized student loans through the Guaranteed Student Loan Program ("GSLP"). The government required state guarantee agencies to establish reserve funds to serve GSLP purposes. When some agencies amassed excess funds and used them for non-GSLP purposes, Congress established reserve fund limits. Great Lakes, a student loan guarantee agency, sued the United States when the government directed it to transfer its excess reserves to federal coffers. The Seventh Circuit made the following findings in determining that Great Lakes' excess reserves were public funds: (1) "[f]ederal law regulates the reserve fund extensively and it exists because of a federal mandate;" (2) "its sources are substantially from the federal government;" and (3) "the uses to which it may be put are restricted" to certain specific GSLP purposes. *Id.* at 14.

### a. ComEd Created and Funded ICECF

An application of the first two *Great Lakes* factors to ICECF highlights a central disagreement between the parties: who created and funded ICECF and why. In late 1999, ComEd contributed $225 million to ICECF pursuant to the Act. As stated above, the parties disagree about whether ComEd's contribution represented consideration for a deal with the state or simply a discretionary gift from the electric utility. This is a critical determination. If a state contract required ComEd to make the contribution, then the first two *Great Lakes* factors would

weigh in favor of deeming the funds public because the state would have created ICECF via contract with ComEd. On the other hand, if ComEd exercised its own discretion in contributing the funds and establishing the foundation, such facts would weigh in favor of the funds being private.

The Act is unambiguous. There is no requirement of action or payment by ComEd. Instead, the Act simply "authorized" ComEd to establish a foundation with certain attributes.

Regardless of the unambiguous statutory language, Defendant urges the Court to consider the statements of a state legislator on the floor of the Illinois General Assembly. Representative Novak commented: "Commonwealth-Edison decided well, we need to give some back. We asked them, you give some back. We're going to allow you . . . to realize a substantial profit. We want you to give something back. . . ." Transcript of Proceedings of 91st General Assembly at 46 (Ill. May 27, 1999). He describes the electric utility as both deciding to contribute on its own and being asked to contribute as part of a *quid pro quo* with the state. Even if Representative Novak's statements were unequivocal, the Court does not rely on legislative history when the statutory language itself is unambiguous. *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 199, 98 S. Ct. 444, 448, 54 L. Ed. 2d 402 (1977) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."); *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 808, 109 S. Ct. 1500, 1504, 103 L. Ed. 29 891 (1989). The unambiguous express language of Section 111.1 does not require ComEd to contribute any funds to ICECF. Defendant's contention to the contrary is not supported by the plain language of its own statute. Accordingly, the Court finds that ComEd — not the state — established and funded ICECF. That it was "authorized" to do so by statute does not alter this finding. Following the reasoning in *Great*

12

*Lakes*, therefore, ComEd's creation and funding of ICECF weigh in favor of deeming the funds at issue private.

### b.     State Regulation

The *Great Lakes* court also noted that the state extensively regulated the reserve fund, and that the agencies could only use the funds for certain narrowly defined purposes.[9]  While there are considerable limitations on the use of ICECF's funds,[10] such uses are not restricted to specific payments as in *Great Lakes*.  Instead, ICECF has operated since 1999 with a considerable amount of leeway in determining how to spend its funds, distributing $38 million without government interference.  *See* 220 ILCS 5/16-111.1(a) (authorizing ICECF to provide financial support to public and private entities "including, but not limited to" specified types of recipients); 16-111.1(b)(8) (allowing the trustees to appoint advisory boards to assist with administration and make recommendations regarding fund disbursement).  Given this amount of self-governance, the restrictions placed on ICECF by Section 111.1 do not transform ICECF's funds into public funds.

Finally, although the *Great Lakes* court found that the extensive federal regulation of the agency "suggests its highly public nature," the court proceeded to analyze whether the plaintiff agency could precisely identify the alleged "'private' property at issue as well as a 'taking' distinguishable from public regulation consistent with the purpose of the instrumentality." *Great*

---

[9] "[T]he uses to which it may be put are restricted to paying default claims, refunding overpayments of insurance premiums, administering the guarantee program, and repaying advances made by the Secretary." *Great Lakes*, 911 F.2d at 14.

[10] Sections 111.1(b)(2) and (7) and 111.1(c) regulate trustee and employee compensation, administrative costs, and annual funding of the Citizens Utility Board.

*Lakes*, 911 F.2d at 15. Finding "no indication that Congress meant for the reserve fund to be irrevocably committed to the guarantee agencies," the Seventh Circuit held that the excess reserves were not "private property" subject to a Fifth Amendment claim. *Id.*

In this case, ComEd established ICECF pursuant to a statute that did not provide for the assimilation of the contributed funds into the treasury of the state of Illinois. The private property at issue is easily identified as the funds contributed to ICECF by ComEd. The "purpose of the instrumentality" of ICECF is to fund environmental projects as directed by its board. Turning over half of its original endowment is inconsistent with that purpose. Accordingly, the funds requested by the state of Illinois from ICECF are private funds.

### 2. Analogous Cases

This result comports with *South Carolina State Education Assistance Authority v. Cavazos*, 897 F.2d 1272, 1276 (4th Cir. 1990). That case addressed the excess reserve funds of another student loan guarantee agency. Holding that the excess reserves were not private property, the court noted that "if property comes within the control of the United States to such an extent that its use is ultimately under the direction of the United States, then it loses its character as 'private' property and becomes public," foreclosing a claim under the Fifth Amendment. *Id.* The court further noted that government regulations completely controlled the use of such excess reserves. *Id.* In this case, as discussed above, Section 111.1 does not grant the state of Illinois complete control over ICECF's funds. Accordingly, ICECF's funds are not "ultimately under the direction" of the state and they are not public funds.

Defendant points to *Dayton-Goose Creek Ry. v. United States*, 263 U.S. 456 (1924), as an analogous case supporting its "public property" argument. In that case, the United States

required railroads to deposit profits earned in excess of a statutory fair return into a fund that fostered interstate commerce by benefitting other railroads. *Id.* The *Dayton-Creek* court, however, described the type of overarching control over the railroad system that is absent in ICECF's case: "[the Transportation Act] puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission," which supervised various specific operations of the private railroads. *Id.* at 477. Further, the Court placed its decision squarely within the realm of railroad law, pointing out Congress's specific power to regulate interstate commerce and noting that the railroad held the excess funds as a trustee for the United States. *Id.* at 477-79. ICECF is not a railroad, and does not hold its funds in trust for the state of Illinois. This Court declines to extend the holding of the eighty-year old railroad case to the question of state control over a privately funded charitable foundation.

### D.    ICECF Has Standing to Assert Federal Constitutional Claims

In a closely related argument, Defendant contends that ICECF is a public entity and therefore has no standing to pursue a takings or due process claim against the state. Defendant relies on *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 115 S. Ct. 961, 130 L. Ed. 2d 902 (1995). In that case, the Court considered whether Amtrak is a government entity for the purposes of a First Amendment suit by a political advertiser. Defendant asserts, with no supporting language from the case, that "[w]hile *Lebron* involved a constitutional claim brought against Amtrak, not by it, the decision does set out the framework for considering the governmental status of a corporation in the context of constitutional claims." (R. 18-1, Def.'s Reply in Supp. of Summ. J., p. 9.) The actual text of the *Lebron* case, however, expressly limits the Court's holding to the First Amendment. *Lebron*, 513 U.S. at 394, 399. Defendant does not

15

discuss whether *Lebron*'s holding might apply differently to a case where (1) takings and due process claims are at issue instead of First Amendment claims; and (2) the constitutional claim is brought *by* the putative governmental entity instead of *against* it.[11]

The other federal cases cited by Defendant to support its contention that ICECF is a public entity are not helpful. *See Trenton v. New Jersey*, 262 U.S. 182, 43 S. Ct. 534, 67 L. Ed. 937 (1923) ("[Constitutional restraints] do not apply as against the state in favor of its own municipalities."); *Comm'rs of Highways v. United States*, 653 F.2d 292 (7th Cir. 1981) (assuming that highway commissions are "legislatively created municipal corporations" and "creatures of the State . . . ."). These cases involve municipal corporations and do not address the question of whether or not an entity is public or private.

Plaintiff urges the Court to consider the Third Circuit's treatment of the Red Cross in a case examining that organization's immunity from jury trial. *Marcella v. Brandywine Hosp.*, 47 F.3d 618 (3rd Cir. 1995). Holding that "the federal government does not manage the day-to-day activities of the organization, does not provide the funds to support its activities, and does not employ or grant civil service benefits to its workers," the court decided that the Red Cross did not share sovereign immunity with the United States such that exposing it to jury trials would be

---

[11] The *Lebron* court highlighted the difference between claims asserted *against* a putative government entity and those asserted *by* a putative governmental entity: "[i]t simply cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy v. Ferguson* can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak." *Id.* at 397 (citation omitted). A similar *reductio ad absurdum* does not result if ICECF is allowed standing to sue as a non-governmental entity.

inconsistent with its charter.[12] *Id.* at 624.

Neither party has provided, and the Court has not found, case law directly addressing the issue of the standing of a privately funded, statutorily chartered entity to bring constitutional claims against the government. Facing this dearth of case law, the Court finds the factors considered by *Lebron* and *Marcella* relevant to its determination. In *Lebron*, the Supreme Court held that "where, as here, the Government *creates a corporation* by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400 (emphasis added). ICECF does not meet this description. As discussed above, Section 111.1 did not create ICECF. ComEd created ICECF, as it was authorized — but not required — to do under Section 111.1. *Cf. N. Ohio Chapter of Assoc. Builders & Contractors, Inc. v. Gateway Econ. Dev. Corp. of Greater Cleveland*, No. 1:92 CV 0649, 1992 WL 119375, *11 (N.D. Ohio May 12, 1992) ("Only if an entity is *allowed* to be formed by a *private actor* is the entity a non-governmental actor").

Turning to the *Marcella* factors, the state of Illinois does not "manage the day-to-day activities of the [ICECF], does not provide the funds to support its activities, and does not employ or grant civil service benefits to its workers." State officials' ability to appoint board members does not amount to control of the foundation.[13] Based on all of these factors, and

---

[12] The court also noted that provisions of the Geneva Convention require the Red Cross to be independent of the United States government.

[13] Section 111.1 requires ICECF to allow certain state officials to appoint its board of trustees. The statute further prescribes a term of five years for trustees, but does not give any state official the right to remove a trustee.

17

considering that the Court has determined ICECF's funds to be private, ICECF has standing to bring a constitutional claim against the state of Illinois.[14]

## E.    Takings Clause

While the Fifth Amendment confirms the state's right to confiscate private property, it requires that such taking must be (1) for public use, and (2) justly compensated.[15]  U.S. Const. Am. V.  There is no question that the state intends to use the disputed funds for public purposes, namely repaying bond obligations and funding state agencies with environmental responsibilities. Likewise, there is no disagreement that Section 111.1(d) does not require any compensation for funds taken from ICECF.  In its motion and opposition to Plaintiff's motion, Defendant has not provided any defenses specific to Plaintiff's takings claim.  Rather, the state has relied solely on its arguments that ICECF is a state-created, state-controlled public entity and that ICECF's funds are public funds.  The Court has rejected those arguments, and finds that Section 111.1(d) performs an unconstitutional taking on the private property of ICECF.

Section 111.1(d) performs a *per se* taking akin to the physical invasion of real property.

---

[14] The Donors Forum of Chicago, as *amicus curiae*, urges the Court "to reaffirm that absent unambiguous intent at the creation of a charitable entity, a state may not change the purposes of such entity simply because the state played a role in the formation or has the power to appoint board members or trustees under the governing statute or bylaws of the organization." (R. 23-1, Amicus Curiae Brief, p. 5.)  The Court declines to make this declaration, as such "reaffirmation" is beyond the scope of this case.

[15] The Supreme Court and Seventh Circuit have required constitutional takings and due process claimants to exhaust state remedies in regulatory takings actions, generally involving land use regulation.  *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934 (7th Cir. 2004); *Hager v. City of West Peoria*, 84 F.3d 865, 869-70 (7th Cir. 1996) (holding that land use regulation plaintiffs "must first pursue their claims, whether in the form of a takings challenge or a due process claim, in Illinois state court.").  The Court will not extend the rule in those cases to require ICECF to bring a claim in state court before coming to federal court.

*Brown v. Legal Found. of Wash.*, 123 S. Ct. 1406, 1416, 155 L. Ed. 2d 376, 393 (2003). If allowed, this taking would result in a loss to ICECF of $125 million. Rather than allowing the transfer and then requiring compensation for Plaintiff's loss, the Court finds that Section 111.1(d) is invalid as an unconstitutional taking. Plaintiff need not give the state $125 million of its private funds. With respect to Count I, Plaintiff's motion for summary judgment is granted.

### F.    Due Process

#### 1.    Procedural Due Process

Plaintiff also argues that the state has violated its right to procedural due process through the enactment of Section 111.1(d). "The standard elements of a due process claim include whether the plaintiff suffered a deprivation of a cognizable property or liberty interest, and whether any such deprivation occurred without due process." *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

The state argues that ICECF received constitutional due process simply because the Illinois legislature enacted Section 111.1(d) through a public process that afforded ICECF the opportunity to be heard. Defendant's reliance on *United States v. Locke*, 471 U.S. 84, 105 S. Ct. 1785, 85 L. Ed. 2d 64 (1985), in support of this argument is misplaced. In *Locke,* the Federal Land Policy and Management Act required mining claim holders to register their claims by a certain date or lose them. Claimants who lost their claims then sued the government for an unconstitutional taking and denial of due process. Refusing the miners' claim, the court noted, "a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and to the extent the statute regulates private conduct, affording those within the

19

statute's reach a reasonable opportunity . . . to comply with those requirements." *Id.* at 108.

In this case, the state's amendment to Section 111.1 does not contain any procedural hoops that ICECF may attempt to jump through in order to retain its funds. Rather, the amendment simply allows the state to dip into the private account of the foundation. *Locke* does not authorize such state action. If merely enacting a statute satisfied all requirements of procedural due process, there would be little that states could not take away from their citizens simply by providing the "procedural due process" afforded by a vote of the state legislature.

Two Seventh Circuit liquor license cases are helpful in determining whether Section 111.1 violates procedural due process. *See Club Misty, Inc. v. Laski*, 208 F.3d 615 (7th Cir. 2000); *Philly's v. Byrne*, 732 F.2d 87 (7th Cir. 1984). In *Club Misty*, the Illinois legislature enacted a statute that allowed voters to revoke the liquor license assigned to a specific street address upon referendum. Citing its own dicta in *Philly's*, the Seventh Circuit struck down this law, reasoning that "it authorizes them to evict a particular seller, as if they were the judges of a housing court or a judge asked to abate a nuisance." *Club Misty*, 208 F.3d at 622. Such adjudicative action on the part of the legislature is not proper under the constitution. In this case, the amendment to Section 111.1 — choosing a single private foundation from which to extract $125 million — is similarly adjudicative in nature and is unconstitutional.

Defendant disputes the application of *Club Misty* with several arguments. First, Defendant objects that it did not execute its action through public referendum. This argument fails, as the *Club Misty* opinion places the blame for the due process violation on the state, not on the voters: "[w]hen the Illinois legislature stepped from allowing a precinct's voters to vote the precinct dry to allowing the voters to expel a particular disfavored licensee, it crossed the line

20

that protects property holders from being deprived of their property without due process of law." *Id.* at 621. Second, the state argues that ICECF had ample opportunity to participate in the legislative process, satisfying procedural due process. This assertion fails in the face of an adjudicative action such as that attempted against ICECF.[16] Third, Defendant argues that "unlike *Club Misty*, here there is no punishment or finding of guilt against ICECF in the amendment [to] Section 16-111.1." This objection refers to the *Club Misty* court's analysis of the law in issue as a bill of attainder. That court analyzed the two issues separately, and did not consider "punishment" or "guilt" in the due process analysis. *Id.* at 618-25. Fourth, Defendant points out that in *Club Misty* it was undisputed that liquor licenses constituted due process property interests, whereas there is some question as to ICECF's funds. As the Court addressed the issue of the private nature of ICECF's funds above, this objection fails. Finally, Defendant argues that ICECF was not "singled out" by Section 111.1, which is a "statute with general import." The Court agrees that Section 111.1 does not mention ICECF by name, but finds the state's argument inconsistent with its vigorous contention that Section 111.1 and ICECF are the products of a specific contract between the state and ComEd. Indeed, the footnote attached to Defendant's argument reveals it to be a rehash of the public-private entity issue already addressed in this opinion.

As it allows the state to perform an adjudicative role in acting against the interests of a

---

[16] Defendant points out that ICECF's treasurer is a member of the Illinois legislature and actually voted for the amendment of Section 111.1. Although this could show that ICECF had notice of the legislative intent to amend the statute, it does not address the improper adjudicative role that the legislature played. Further, as there is no evidence or argument that ICECF is bound by the vote of its officer in the legislature, the treasurer's vote does not indicate assent on the part of ICECF.

particular individual entity, the amendment to Section 111.1 is a violation of ICECF's right to protection from deprivation of property without due process of law. Accordingly, Plaintiff's motion for summary judgment is granted with respect to Count IV.

### 2. Substantive Due Process

Plaintiff also claims that its right to substantive due process is violated by the state's action. Such a claim requires an inquiry separate from the procedures of the legislature. "[The Supreme Court's] prior cases have held the provision that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law,' to 'guarante[e] more than fair process,' and to cover a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S. Ct. 1708, 1713 (1998) (citing *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772 (1997); U.S. Const., Am. 14, § 1).

Because of its ruling on the issue of procedural due process, the Court need not consider whether Defendant also violated Plaintiff's right to substantive due process. Nevertheless, even if Defendant had not violated ICECF's right to procedural due process, the state's actions violate substantive due process as well. Substantive due process requires only that the accused state action be rationally related to a legitimate government interest.[17] *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). The state argues that its amendment of Section 111.1 is related to the interest of repaying general bond obligations and funding environmental agencies. This argument would allow siphoning from any private entity upon a showing by the state that the

---

[17] The "rationally related" test is applicable if the right asserted by a plaintiff is not a fundamental right recognized under the Constitution. ICECF does not argue that its funds trigger any fundamental right.

funds would go to a legitimate cause. Accordingly, Defendant's argument proves too much, and cannot justify its legislative demand upon ICECF. Although a finding of a substantive due process violation is unnecessary given the Court's holding with respect to procedural due process, the state's amendment of Section 111.1 also violates Plaintiffs right to substantive due process.

## CONCLUSION

Defendant's motion for summary judgment is granted with respect to Counts II, III, and V. Plaintiff's state-court claims are barred by the Eleventh Amendment of the United States Constitution. Plaintiff's motion for summary judgment is granted with respect to Counts I and IV.

Dated:   April 29, 2004

ENTERED

AMY J. ST. EVE
United States District Court Judge